MATTHIAS THEISEN *vs.* WILLIAM F. PORTER *et al.*

Argued Jan. 24, 1894. Reversed Feb. 26, 1894.

No. 8564.

**When a negligent act of a servant is within the course of his employment.**

In determining whether a particular act was done in the course of a servant's employment, the question is, was it committed by the authority of the master, expressly conferred, or fairly implied from the nature of the employment, and the duties incident to it? And, in determining the question of authority, we are to regard the object, purpose, and the end of the employment.

**Facts examined. Held a case for the jury.**

*Held*, on an examination of the record in this case, that the court below erred in dismissing the same.

Appeal by plaintiff, Matthias Theisen, as administrator of the estate of John Lohr, deceased, from an order of the District Court of Hennepin County, *Seagrave Smith, J.,* made September 19, 1893, denying his motion for a new trial.

The defendants, William F. Porter and George C. Andrews, were partners in the business of steam fitters and contractors. They were employed by the Minneapolis Brewing and Malting Company, in the spring of 1892, to construct and place in position a system of steam pipes in its Marshall Street breweries connecting the boilers in the detached boiler house with the steam engines, pumps and machinery in the main buildings. The work was delayed by nonarrival of pipe. The weather became warm and the company thought it necessary to start a refrigerating machine to cool the storehouse where beer was kept. To do this a temporary six inch steam pipe was put in, running from the boilers into the basement and from which steam was drawn to run the refrigerator engine. This six inch pipe was also connected in the basement with the new ten inch permanent steam pipe put in by defendants. On the evening of June 26, 1892, after work for the day had ceased, steam was turned into this ten inch pipe through both connections. This was done by defendant's foreman Teetsel. The water from condensation of steam in the six inch pipe flowed forward into the ten

inch pipe and being cooler than the steam already there from the other connection condensed it in part and formed a water slug, with steam coming from the boilers behind, and a vacuum before, it was shot with great force to the further end of the ten inch pipe and there broke it. The hot water and steam escaping scalded John Lohr a workman in the employ of the Brewing Co., so that he died next day. Plaintiff was appointed administrator of his estate and brought this action, under 1878 G. S. ch. 77, § 2, to recover $5,000 for the benefit of his widow and children. The defendants answered that the turning on of steam in this way at that hour to run the refrigerating engine for the Brewing Company was not within the scope of Teetsel's employment by them, so as to render them liable for his negligence. At the trial the court sustained defendant's contention and dismissed the action. Plaintiff excepted, moved for a new trial and being denied appeals.

*Morton Barrows,* and *Wilson & Van Derlip,* for appellant.

The conditions constituted defendants independent contractors. *Hexamer* v. *Webb,* 101 N. Y. 377; *City of Erie* v. *Caulkins,* 85 Pa. St. 247; *Cuff* v. *Newark & N. Y. R. Co.,* 35 N. J. Law, 17; *Callahan* v. *Burlington & C. R. Co.,* 23 Ia. 562.

It was the negligent and improper construction and connection of the steam pipes that caused the explosion. The view of the trial court that there was no fault in the construction of the six inch pipe and its connection with the ten inch pipe, was founded upon a misapprehension of the evidence.

In turning steam into the pipes, Teetsel was acting within the scope of his employment as the servant of defendants. An agent is acting within the scope of his employment if the act complained of be committed while he is engaged in the business of his principal, or in the fulfillment of his principal's undertaking, although the act be beyond the agent's authority, or even in disobedience of his master's express directions, and although the act be ill-advised or unnecessary, if it be done in the prosecution of the work in hand, or in furtherance of the master's interests, or upon some emergency, or in the preservation of the master's property. *Walker* v. *Johnson,* 28 Minn. 147; *Jervis* v. *Hoyt,* 5 T. & C. 199; *Gilmartin* v. *Mayor*

*of City of N. Y.*, 55 Barb. 239; *Geraty* v. *Stern*, 30 Hun 426; *Quinn* v. *Power*, 87 N. Y. 535.

The main pipes had been put in by defendants to be used for sixty days upon trial, to be removed at their expense if not satisfactory to the Brewing Co.; they had been thus in use for forty days at the outside, and were therefore still the property of the defendants. *Elphick* v. *Barnes*, 5 C. P. Div. 321; *Ellis* v. *Mortimer*, 4 Bos. & P. 257; *Hunt* v. *Wyman*, 100 Mass. 198; *Pierce* v. *Cooley*, 56 Mich. 552.

When the foreman on the evening of the explosion, engaged at the time in the business of his employment, heard the hammering in the pipes, which might endanger their safety, they being still owned by his employers, it was his natural impulse and his duty to look out for their preservation; it was essential that no injury should happen to them until the trial term had expired and they had approved themselves to the Brewing Company; an emergency arose in which he acted as his judgment dictated to be proper; he was actuated by no motive except fidelity to the charge entrusted to him. *Waters* v. *Pioneer Fuel Co.*, 52 Minn. 474.

But it is enough to say that in any event it was for the jury to determine as a question of fact whether or not Teetsel was acting within the scope of his employment. *Courtney* v. *Baker*, 60 N. Y. 1; *Jackson* v. *Second Ave. R. Co.*, 47 N. Y. 274; *Hilliard* v. *Goold*, 34 N. H. 230; *Rounds* v. *Delaware L. & W. R. Co.*, 64 N. Y. 129; *Mott* v. *Consumers' Ice Co.*, 73 N. Y. 543; *Shea* v. *Sixth Ave. R. Co.*, 62 N. Y. 180.

If Teetsel acted outside the scope of his employment and the explosion was due to his negligence concurring with defendants' negligence in so connecting the pipes, the defendants are liable. *Johnson* v. *Northwestern Tel. Exch. Co.*, 48 Minn. 433.

*William J. Hahn*, and *Woods & Kingman*, for respondents.

Defendants were not independent contractors, but were the servants of the Brewing Company employed by it to furnish laborers and material for the work. As to the construction of the twelve inch main, and possibly the ten inch and the original six inch main, defendants may have been independent contractors. But that

work had been completed, tested and in use six weeks previous to the accident. In the meantime, defendants were making a large number of connections and being paid for it by the hour. It was impossible to make any definite contract with regard to this work. In other words, the men employed by defendants simply remained on the premises after the contract work was finished, doing whatever work was ordered from time to time by the officers of the Brewing Company. Teetsel was a fellow servant with Lohr, and defendants are not liable for his negligence. *Linnehan* v. *Rollins*, 137 Mass. 123; *Casement* v. *Brown*, 148 U. S. 615; *Railroad Co.* v. *Hanning*, 15 Wall. 649.

If the defendants were not independent contractors but servants of the Brewing Company, then they are not responsible to Lohr's administrator for the negligence or other fault of his fellow servant, even though the latter were under the control and direction of the former as the representative of the master. *Brown* v. *Lent*, 20 Vt. 529; *Stone* v. *Cartwright*, 6 T. R. 411; *Bath* v. *Caton*, 37 Mich. 199; *Johnson* v. *City of Boston*, 118 Mass. 114; *Rourke* v. *White Moss Colliery*, 1 C. P. Div. 556; *Wiggett* v. *Fox*, 11 Exch. 832.

The steam pipes were properly constructed for the purpose for which they were to be used, and the accident was due, not to bad construction, but to improper handling.

Although Teetsel assumed to turn steam on and off the pipes and although the accident was caused by his negligent manner of doing so, defendants are not liable; because in so doing he was acting beyond the scope of his employment. The act for which the master is to be held liable must be something incident to the employment for which the servant is hired and which it is his duty to perform. *Stevens* v. *Woodward*, 6 Q. B. Div. 318; *Morier* v. *St. Paul M. & M. Ry. Co.*, 31 Minn. 351; *Stone* v. *Hills*, 45 Conn. 44; *Aycrigg's Executors* v. *New York &c. R. Co.*, 30 N. J. Law, 460; *Gordon* v. *Rolt*, 7 D. & L. 87; *Storey* v. *Ashton*, L. R. 4 Q. B. 476.

The plea that Teetsel was engaged in an effort to protect his master's property is based upon a fiction. Defendants had no property to be protected. The sixty day contract applied only to the twelve inch main and the condition as to that was that if it was not satisfactory, if it did not stand the test, they would take

it out at the end of sixty days. The pipe belonged to the company, since the agreement was, not that the company would take the pipe if it proved satisfactory, but that it might be returned if unsatisfactory. A difference which makes all the difference between an option to purchase and an actual sale. *Hunt* v. *Wyman,* 100 Mass. 198.

COLLINS, J. This was an action to recover damages for the death of plaintiff's intestate, John Lohr, alleged to have been the result of defendants' negligence. The trial court dismissed the action when plaintiff rested, and afterwards refused a new trial. The facts appearing were that defendants had been employed by the Minneapolis Brewing Company, for whom Lohr was then working, to put in a system of steam piping and connections at one of its plants. This piping was to run from the boilers in a boiler room, through a tunnel, to the basement of the main building, some sixty feet. thence across one end and along one side of the basement, the connections being with the engines and other apparatus on the floor above. The exact details of the work had not been determined when defendants commenced work, and it was agreed that the company should pay for the necessary materials at cost, and for the labor of defendants' men while putting it in place, at a certain rate per hour. The company indicated in a general way what was needed in the line of pipes and connections, but defendants made all plans, had charge of the workmen, and the manner in which the work was done. There was some delay, but under the superintendence of one Teetsel, a foreman, defendants' workmen put in a twelve-inch main from the battery of boilers through the tunnel, and across the front end of the basement. Here it turned at right angles, and was reduced to a ten-inch pipe. This pipe was continued along the side of the basement some distance, and then terminated in what is known as a "blind flange," or "cap." Connecting with these main pipes were a number of smaller pipes, of various sizes, running to the engines and other apparatus on the floors above. In the ten-inch pipe, at a point near to where it connected with the twelve-inch, a cut-off valve was placed; so that in the winter season, when the refrigerators were not in use, steam could be cut off from that part of the ten-inch pipe beyond, which

was nearly all of it. While being delayed, as before mentioned, owing to the nonarrival of material, and before the system was fully ready for use, it became important that the company should operate its refrigerators, the connection being from the ten-inch pipe, at a point beyond the cut-off valve; and defendants were directed to put in, for temporary use, a six-inch pipe leading from two of the boilers, through the tunnel, and across the basement, to the ten-inch pipe, there to connect at a point beyond the cut-off valve; the plan being to run the steam through the six-inch pipe into the ten-inch pipe, at a point between the cut-off valve and the connection with the refrigerator engine. With the valve closed, the steam would necessarily reach the engine, and no part of it would go back, towards the boilers, into the twelve-inch main. For putting in the six-inch pipe, and making such connections as were needed to accomplish the anticipated result, defendants were to be paid an agreed sum, and all materials were to be returned to them when the permanent system was completed to the satisfaction of the brewing company. The six-inch pipe was put in, and a connection with the ten-inch was made, all under the direction of defendants' foreman. The pump used to supply the boilers with water at the time of the accident was operated solely by steam taken from the six-inch pipe. To operate the pump, or to use the boilers for any purpose, it was necessary to turn the steam into that pipe. No cut-off valve had been put into it, nor was there a drip pipe or "bleeder;" so all condensation had to run into the ten-inch pipe, and escape through a drip near the flange or cap at its end. After the twelve-inch main was fitted up, the packing leaked, more or less; so that for repairs, and at different times, the company was obliged to shut off steam therefrom, and, when needed for use in operating the refrigerators, to conduct steam through the six-inch pipe. It was shown that whenever steam was shut off or turned on to the twelve-inch main, up to the day of the accident, it had been done at the request of and under the supervision of Teetsel, the foreman.

On June 26, 1892, the permanent system was ready for continuous use, and Teetsel, with other men in defendants' employ, went to the brewery building to finish making connections, and to disconnect the six-inch pipe, that it might be removed. The fires under

the boilers had been put out the night before, in anticipation of the work. The men worked all day, but did not have time to disconnect, as expected. Towards evening the fires were started up, and, when steam was generated, the fireman went through the tunnel, to inform the company's engineer, who was in the basement, that, to start the pump, he needed steam in the six-inch pipe. Thinking that Teetsel was then at work upon the main, the engineer closed the cut-off valve in the ten-inch pipe, so that the steam would not work back towards the boilers, and directed the fireman to let steam into the six-inch, which was done. As it came through the pipe, the steam "hammered." Teetsel, hearing this, remarked to the engineer that steam was not turned on right, whereupon the latter said, "You are in charge here, and had better turn it on yourself." Teetsel, after telling the engineer to open the cut-off valve slowly, went to the boiler house, had the fireman shut off steam from the six-inch pipe, and then, while he was slowly turning it into the twelve-inch main, told the fireman to very slowly let it on again into the six-inch. When steam was fully on to the main, Teetsel returned to the basement, and soon afterwards, while the fireman was still engaged with the six-inch pipe, the ten-inch burst, a few inches from the flange or cap. Lohr had just been sent to that point by the brewery company's engineer to look after the drip pipe or bleeder, and received injuries, which caused his death.

It has been noticed that the six-inch pipe and that part of the ten-inch beyond the cut-off valve were filled with steam after having been unused for several hours, and then the steam supply was shut off at the boilers. Rapid condensation of the steam in the pipes would follow, and the accumulation could only escape by way of the drip pipe or bleeder at the end of the ten-inch pipe. Very soon after steam was thus shut off, it was given, simultaneously, to both the six-inch and the twelve-inch pipes. By means of the steam turned onto the six-inch, the condensation would be driven rapidly along into the ten-inch, and there it would be overtaken by the larger volume of steam coming from the twelve-inch main; the naturally to be anticipated and almost inevitable result being, according to expert testimony, the formation in the pipe of a "hammer" or "slug," which is a body of water driven by the steam along the pipe with great velocity, and almost irresistible force. All

concede that in the construction, as well as in the management, of steam pipes, every precaution should be taken to avoid these formations, and there seemed to be no doubt but that the accident in question was caused by one.

It is contended by respondents that it was conclusively shown that they were not independent contractors, but simply the servants of the brewing company, and consequently fellow servants with appellant's intestate. It is also contended that the evidence established with equal certainty that the pipes were properly constructed for the purpose designed, and that the accident was not due to bad construction, but to improper handling after the work was completed, and was under the management of the brewing company; and, further, that it was shown that although Teetsel, their foreman, may have assumed to turn steam off and on at the time of the accident, and in doing so may have been negligent, he was then acting beyond the scope of his employment; hence no liability would arise on the part of respondents. We are clearly of the opinion that on all of these propositions the case should have been submitted to the jury. Certainly, there was evidence to sustain a finding that respondents were independent contractors, at least when putting in the temporary pipe; and expert witnesses sustained, by their testimony, appellant's position that ordinary care and prudence required that a cut-off valve, or a "bleeder," perhaps both, should have been put in this pipe, and that, without one or both of these appliances, there was continual danger of an accident of the precise character of that which occurred. That the accident resulted from such defective construction, and not from the manner in which the steam was handled by defendants' foreman, would, of course, have to be shown, to render defendants liable on that ground alone.

It was also for the jury to say on the evidence whether Teetsel, the foreman, was acting within the scope of his employment, and for defendants, and also whether he acted negligently, when he gave directions to the servants of the brewing company about opening the cut-off valve, shutting off from and turning steam into the small pipe while he turned it into the larger. Defendants cannot be held responsible for an act or omission of their foreman which was not connected with the business in which the foreman

was employed, and which did not happen in the course of his employment. If he stepped aside from his master's business, for however short a time, to do an act not connected with such business, the relation of master and servant was suspended for the time. *Morier* v. *St. Paul, M. & M. Ry. Co.*, 31 Minn. 351, (17 N. W. 952.) But, in determining whether a particular act was done in the course of a servant's employment, it is proper to inquire whether he was at the time serving his master. The test of liability in all cases depends upon the question whether the injury was committed by the authority of the master, expressly conferred, or fairly implied from the nature of the employment and the duties incident to it; and, in determining the question of authority, we are to regard the object, purpose, and end of the employment. Wood, Mast. & S. §§ 279, 286. Naturally, it would be impossible to lay down a general rule by which all cases could be decided, for in every instance it becomes a mixed question of law and fact, to be settled by reference to the peculiar facts and circumstances of the case.

Order reversed.

(Opinion published 58 N. W. Rep. 265.)

Application for reargument denied April 6, 1894.